**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| WOODS SERVICES, INC. | CIVIL ACTION |
|---|---|
| v. | NO. 18-296 |
| **DISABILITY ADVOCATES, INC.,** *d/b/a* *Disability Rights New York* | |

## MEMORANDUM RE: MOTION TO DISMISS

**Baylson, J.**                                                  **October 17, 2018**

## I. Introduction

In this case, Plaintiff Woods Services, Inc. ("Plaintiff") has moved, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss counterclaims filed by Defendant Disability Advocates, Inc. d/b/a Disability Rights New York ("Defendant").

For the reasons described below, the motion is granted in part and denied in part.

## II. Relevant Factual and Procedural History

As discussed in a prior opinion of this Court (ECF 26), Plaintiff's complaint (ECF 1, "Compl."), filed on January 24, 2018, alleges that Defendant issued a public report (the "DRNY Report") regarding purported abuse and neglect of New York residents in the care of Plaintiff, a provider of residential, educational, and clinical services to children and adults with developmental disabilities. (Id. ¶ 1). According to Plaintiff's complaint, all investigations and inquiries have generally found no basis for the DRNY Report's allegations of abuse and neglect. (Id. ¶ 3). Plaintiff's complaint brings causes of action for defamation, commercial disparagement, intentional interference with contractual relationships, and intentional interference with prospective contractual relationships.

On February 15, 2018, Defendant filed a motion to dismiss Plaintiff's complaint (ECF 8),

1

which this Court denied on May 9, 2018.  (ECF 26).  In the Court's opinion, the Court found:

(1) The Court has personal jurisdiction over Defendant;

(2) Pennsylvania law applies to Plaintiff's claim for defamation;

(3) Whether Plaintiff is a public figure is a question of fact inappropriate for resolution at the motion to dismiss stage; and

(4) The complaint satisfies Plaintiff's obligations to plead actual malice.

On June 4, 2018, Defendant timely answered Plaintiff's complaint and brought counterclaims.  (ECF 32).  On June 25, 2018, Plaintiff filed a motion to dismiss Defendant's counterclaims.  (ECF 40).  On July 16, 2018, Defendant amended its counterclaims as a matter of course, pursuant to Fed. R. Civ. P. 15(a)(1)(B).  (ECF 42, "AC" or "Amended Counterclaims").  Thereafter, on July 30, 2018, Plaintiff timely filed the subject of this Memorandum:  a motion to dismiss Defendant's Amended Counterclaims.  (ECF 43, "Mot.").  Defendant filed a response on August 13, 2018 (ECF 47, "Opp'n"), and Plaintiff filed a reply on August 20, 2018.  (ECF 51, "Reply").  This Court held oral argument on the motion, as well as on two discovery motions, on September 20, 2018.  (ECF 63).

## III.    The Amended Counterclaims

Defendant's Amended Counterclaims allege that, pursuant to 42 U.S.C. § 15001, et seq., any State that accepts federal financial assistance for services for individuals with developmental disabilities is required to have a system to protect and advocate the rights of individuals with developmental disabilities.  (AC ¶¶ 3–4).  Such a system is allegedly referred to as a Protection & Advocacy System ("P&A System"), and Defendant alleges that it serves as the designated P&A System for New York State.  (Id. ¶ 1).  Defendant alleges that it receives eight federal grants, and, pursuant to its mandate under federal law, investigates allegations of abuse and

neglect, engages in individual advocacy, and pursues systemic litigation on behalf of persons with disabilities. (Id. ¶ 12).

Defendant alleges that on or about October 26, 2017, it provided a copy of the DRNY Report—titled "Abuse & Neglect of New York State Residents at Woods Services in Pennsylvania"—to Plaintiff. (Id. ¶ 15). Thereafter, according to Defendant's Amended Counterclaims, on October 30, 2017, Defendant released the report. (Id. ¶ 16). Also on October 30, 2017, Defendant alleges, Plaintiff posted to its website a document entitled "Wood's Response to the DRNY Report," which Defendant alleges contained false, misleading, and defamatory statements about Defendant and its staff. (Id. ¶¶ 17–19). Although Plaintiff has attached that response to its Motion, this Memorandum will limit its analysis to the allegations of Defendant's Amended Counterclaims. Those allegations include, but are not limited to, statements by Plaintiff that Defendant had an "extremist agenda," that Defendant reported certain findings that it knew or should have known were "specious" and "completely false," that Defendant "misuses" taxpayer funds, and that Defendant engaged in harassment and disparagement of Plaintiff. (See id. ¶¶ 20–41).

Defendant also asserts that, in addition to the statements contained in the October 30, 2017 document described above, Plaintiff made other false statements to the New York State Office for Persons with Developmental Disabilities, and engaged in conduct to undermine and restrict Defendant's access to its clients such as by failing to provide residents with a phone in a private setting so they could speak to Defendant's attorneys in confidence. (Id. ¶ 46–48).

Defendant further alleges that Plaintiff's sought-after relief in this litigation, as evidenced by its complaint and settlement demands, violates federal law and is made for the purposes of intimidation. (See, e.g., id. ¶¶ 50, 51, 53–55, 155).

Defendant also alleges that Plaintiff has retaliated and discriminated against Defendant, its lawyer, Michael Fiske, its staff, and Plaintiff's own patients and residents by interfering with Defendant's rights under federal law.  (See, e.g.., id. ¶¶ 101, 116).

Therefore, Defendant brings the following counterclaims:

Count I:      Defamation

Count II:     Retaliation under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (the "ADA")

Count III:    Retaliation under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794

Count IV:    Common Law Abuse of Legal Process

Count V:     Violation of New York Anti-SLAPP Law, N.Y. Civ. Rts. Law §§ 70–a, 76–a

## IV.     Legal Standard

In considering a motion to dismiss under Rule 12(b)(6), "we accept all factual allegations as true [and] construe the complaint in the light most favorable to the plaintiff." Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 84 (3d Cir. 2011) (internal quotation marks and citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

## V.     Analysis

### A.     Count I: Defamation

#### 1.     Parties' Contentions

Plaintiff's motion to dismiss contends that Defendant's counterclaim for defamation fails to state a claim because:

> (1) Defendant is a public figure exercising governmental power, such that defamation claims it brings must plead actual malice;
>
> (2) Defendant's counterclaim fails to demonstrate actual malice;

(3) Plaintiff's allegedly defamatory statements, when viewed in context, are not defamatory;

(4) Plaintiff's allegedly defamatory statements are statements of opinion that are not provable as false, such that they cannot form the basis for a defamation claim; and

(5) Defendant has failed to allege special harm against Plaintiff.

In response, Defendant asserts that:

(1) Determining whether Defendant is a "public figure" would be premature at this stage in the litigation;

(2) Determining whether there is "actual malice" would be premature at this stage in the litigation;

(3) Defendant's counterclaim sufficiently alleges actual malice by Plaintiff

(4) Defendant's statements are not pure opinion, are provable, and have a defamatory meaning; and

(5) Defendant has adequately alleged special harm.

In its reply, Plaintiff contends, among other things, that it would not be premature for the Court to determine that Defendant is a "public figure" or that Defendant failed to plead "actual malice," as there are various cases resolving those issues at the motion to dismiss stage.

## 2. First Amendment Analysis

The Supreme Court requires that when a "public figure" asserts a claim for defamation, the cause of action must plausibly allege that the statements were published with "actual malice." See Curtis Publishing Co. v. Butts, 388 U.S. 130, 162–65 (1967) (Warren, C.J., concurring); New York Times Co. v. Sullivan, 376 U.S. 254, 279–80 (1964). A party is determined to be a public figure by examining "the nature and extent of an individual's participation in the particular controversy giving rise to the defamation." Gertz v. Robert Welch, Inc., 418 U.S. 323, 352 (1974). The Court has indicated that parties who are not public figures for all purposes may still be limited-purpose public figures with respect to a particular controversy. Id.

Defendant does not admit or deny that it is a public figure, but instead argues that the determination is better made with the benefit of a full factual record. As this Court previously

determined as to Plaintiff, whether Defendant is a limited-purpose public figure is a "difficult and fact-specific" question, not suitable for resolution under Rule 12(b)(6). <u>See</u> <u>Woods Servs., Inc. v. Disability Advocates, Inc.</u>, No. CV 18-296, 2018 WL 2134016, at *6 (E.D. Pa. May 9, 2018) (citing <u>Schiavone Const. Co. v. Time, Inc.</u>, 619 F. Supp. 684, 702 (D.N.J. 1985); <u>Marcone v. Penthouse Intern. Magazine for Men</u>, 754 F.2d 1072, 1082 (3d Cir. 1985)). Thus, this Court will again reserve the question of whether Defendant is a public figure for a later time.[1]

Under New York law,[2] "a private figure complaining of defamation with respect to a matter that is 'arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition,' may not recover unless he or she establishes that the defendant 'acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.'" <u>Greene v. Paramount Pictures Corp.</u>, 138 F. Supp. 3d 226, 236–37 (E.D.N.Y. 2015) (quoting <u>Chapadeau v. Utica Observer-Dispatch</u>, 341 N.E.2d 569, 571 (N.Y. 1975)). Assuming without deciding that the defamation here is within the sphere of public concern, the Amended Counterclaims contain sufficient allegations to claim negligence or gross negligence on Plaintiff's part, including allegations that Plaintiff falsely stated it took certain actions before and

---

[1]    Again, this Court notes that for purposes of this limited inquiry under Rule 12(b)(6), and assuming all allegations as true, Defendant has sufficiently alleged actual malice in its Amended Counterclaims.

[2]    Plaintiff argues, and Defendant does not dispute, that New York law controls Defendant's counterclaim for defamation because Defendant is domiciled in New York. This Court previously determined that the state law of a party's domicile should govern that party's claim for defamation, and thus applied Pennsylvania law to Plaintiff's defamation claim. <u>See</u> <u>Woods Servs., Inc.</u>, 2018 WL 2134016 at *4. Because Defendant is domiciled in New York, and because the defamation laws of New York and Pennsylvania likely conflict on the standard of fault that must be applied to a private figure, <u>see</u> <u>Franklin Prescriptions, Inc. v. The New York Times Co.</u>, 267 F. Supp. 2d 425, 432 (E.D. Pa. 2003) (Rufe, J.), this Court applies New York law to Defendant's counterclaim for defamation.

during Defendant's investigation, when in fact Plaintiff had taken those actions after the investigation was over; allegations that Plaintiff "cherry picked misleading statistics"; and allegations that Plaintiff "categorically" denied Defendant's allegations while later admitting that certain events did, in fact, take place. See AC ¶¶ 39, 43, 44.

### 3. Defamatory Meaning Analysis

The allegations contained in the Amended Counterclaims are also sufficiently capable of defamatory meaning to overcome Plaintiff's motion to dismiss. Because "falsity is a necessary element of a defamation cause of action and only 'facts' are capable of being proven false, 'it follows that only [false] statements alleging facts can properly be the subject of a defamation action.'" Gross v. New York Times Co., 82 N.Y.2d 146, 153, 623 N.E.2d 1163 (N.Y. 1993) (quoting 600 W. 115th St. Corp. v. Von Gutfeld, 80 N.Y.2d 130, 139, 603 N.E.2d 930 (N.Y. 1992)). At this stage of litigation, the Court may consider the following factors in order to determine the distinction between assertions of fact and nonactionable expressions of opinion:

(1)  whether the specific language in issue has a precise meaning which is readily understood;
(2)  whether the statements are capable of being proven true or false; and
(3)  whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal . . . readers or listeners that what is being read or heard is likely to be opinion, not fact.

Id. (internal quotations omitted).

Contexts that have been found to be strongly suggestive that alleged statements were actually opinions include: the editorial page of a newspaper, a letter to the editor of a professional journal, a public community board hearing, and communications between a union official and a "scab" during a heated labor dispute. Brahms v. Carver, 33 F. Supp. 3d 192, 199 (E.D.N.Y. 2014) (collecting cases).

Here, Defendant merely alleges that the statements were made on Plaintiff's own website and "blog." See AC ¶¶ 17–18. These forums do not strongly suggest that the alleged statements were actually opinions. Further, taking the Amended Counterclaims in a light most favorable to Defendant, many of the alleged false statements are capable of being proven true or false, such as allegations that Defendant should have known its findings regarding unhygienic and unsafe facilities were completely false; that Defendant misuses taxpayer funds; that Defendant engaged in harassment and disparagement; and that Defendant's legal representation was "an intensive sales pitch" to obtain clients. See AC ¶¶ 28, 34, 36, 38, 41.[3] Thus, the allegations contained in Defendant's Amended Counterclaims are sufficiently capable of defamatory meaning to overcome Plaintiff's motion to dismiss.

### 4.    Damages

Plaintiff also moves to dismiss on the basis that Defendant's Amended Counterclaims do not contain an adequate allegation of special damages. Mot. at 18 n.11. In New York, a claim for defamation requires allegations of special damages unless the defamation falls into one of four established categories of defamation per se: statements charging a party with a serious crime; statements that tend to injure a party in its business; statements that a party has a loathsome disease; or statements imputing unchastity to a party. Liberman v. Gelstein, 80 N.Y.2d 429, 434–45, 605 N.E.2d 344 (N.Y. 1992). Special damages are those that "contemplate the loss of something having economic or pecuniary value." Id. (internal quotations omitted).

---

[3]    Plaintiff cites Hull v. Town of Prattsville, 145 A.D.3d 1385, 1388 (N.Y. App. Div. 2016) to support its contention that a statement accusing a party of engaging in harassment is opinion, not fact. See Reply at 4. But that case was decided on summary judgment with the benefit of a factual record. This decision merely finds that, when taking the Amended Counterclaims in a light most favorable to Defendant, the statement is capable of being proven true.

Taken in a light most favorable to Defendant, the Amended Counterclaims contain sufficient allegations of damages to overcome Plaintiff's motion to dismiss.

For the above reasons, Plaintiff's motion to dismiss Count I is denied.

**B.     Counts II and III: Retaliation under the ADA and Rehabilitation Act**

### 1.     Parties' Contentions

In its motion to dismiss, Plaintiff contends that Defendant's counterclaims for retaliation fail to state a claim because:

(1) Both the ADA and Rehabilitation Act protect against retaliation against individuals, and Defendant is an entity not covered by the provisions; and

(2) The Rehabilitation Act requires that Defendant allege the improper reason that it is being retaliated against, which Defendant fails to do;

In its response, Defendant asserts:

(1) Its counterclaims adequately allege that Defendant and its employees were discriminated against via Plaintiff's response to the DRNY report, filing of the present lawsuit, and improper conduct in the litigation;

(2) Case law and statutory context make clear that entities may bring lawsuits for ADA retaliation;

(3) DRNY has standing to assert retaliation claims on behalf of its employees and staff

### 2.     Analysis Regarding Defendant's Claims

The ADA and Section 504 of the Rehabilitation Act both prohibit persons from retaliating against "individuals" who exercise their rights under those statutes. See 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful [by the ADA]."); id. § 12203(b) (making it "unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected" by the ADA); 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . [shall]

be subjected to discrimination under any program or activity receiving Federal financial assistance.").

The term "individual" is undefined in both statutes, and Defendant has not identified any case law extending the protections of the above provisions to entities or corporations such as itself.[4]  In Michigan Flyer LLC v. Wayne Cty. Airport Auth., 860 F.3d 425 (6th Cir. 2017), the Sixth Circuit held that Section 12203's use of the term "individual" is "unambiguous and does not include corporations."  Id. at 431.  Important to the Sixth Circuit's analysis was Section 12203's parallel use of the terms "person" and "individual," suggesting that the two words should be afforded distinct meanings.  Id. at 429.  Michigan Flyer comports with decisions that are precedential to this Court, particularly regarding the directive to consider a word's "ordinary, contemporary, [or] common meaning," in the absence of a statutory definition.  Perrin v. United States, 444 U.S. 37, 42 (1979).  Without any authority to the contrary, Defendant may not maintain a cause of action for retaliation under the ADA or Section 504 of the Rehabilitation Act on Defendant's own behalf.

### 3. Analysis Regarding Defendant's Representational Claims

Defendant also brings its retaliation claims on behalf of its employees and on behalf of Plaintiff's patients or residents, none of whom are parties to this litigation.  Again, Defendant fails to identify any authorities that have recognized an organization's associational or representational standing to bring retaliation claims on behalf of employees or disabled persons like Plaintiff's patients.

---

[4]  Defendant's citation to Clinton v. City of New York, 524 U.S. 417 (1998) is distinguishable because it involves an interpretation of the federal Line Item Veto Act, not the statutes at issue here.  Moreover, the Supreme Court expressly explained that it was interpreting "individual" and "person" as synonymous after considering "the context of the entire section." Id. at 428.

### a. Defendant's Standing on Behalf of its Employees

Although Defendant argues that it has special standing to assert claims on behalf of its employees, the cases it cites in support of that proposition all involve claims for injunctive relief. Opp'n at 21–22. Moreover, none of those cases involve retaliation claims brought pursuant to the ADA or Section 504 of the Rehabilitation Act. Defendant therefore has no basis to assert such claims on behalf of its employees.

### b. Defendant's Standing on Behalf of Plaintiff's Patients

Similarly, Defendant has not sufficiently pled a cause of action on behalf of Plaintiff's patients/residents for damages arising out of alleged retaliation. To make out a claim for associational standing on behalf of Plaintiff's patients or residents under Article III, Defendant must allege that:

(a) its members would otherwise have standing to sue in their own right;
(b) the interests it seeks to protect are germane to the organization's purpose; and
(c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

Pa. Psychiatric Soc. v. Green Spring Health Servs., Inc., 280 F.3d 278, 283 (3d Cir. 2002) (quoting Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977)). "[D]amages claims usually require significant individual participation, which fatally undercuts a request for associational standing." Id. at 284. Because Defendant seeks monetary damages for its retaliation claims under the ADA and the Rehabilitation Act, Defendant cannot allege traditional, Article III associational standing on behalf of Plaintiff's patients or residents for those claims.

In addition to the traditional grounds for asserting associational standing, however, Defendant contends that it has statutory "authority to pursue legal, administrative, and other appropriate remedies to ensure the protection of people with disabilities" because it is a P&A

11

System.  Opp'n at 23 (citing 42 U.S.C. § 15043(a)(1), (a)(2)(A)(i); 42 U.S.C. §§ 10805(a)(1)(B),

10801(b)(2)(A)).  Section 15043 provides, in relevant part:

> In order for a State to receive an allotment under part B of this subchapter or this part - - the State shall have in effect a system to protect and advocate the rights of individuals with developmental disabilities; such system shall - - have the authority to - - pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of such individuals within the State . . . .

42 U.S.C. § 15043(a)(1)–(a)(2)(A)(i).

> Section 10805 provides, in relevant part:

> A system established in a State . . . to protect and advocate the rights of individuals with mental illness shall - - have the authority to . . . pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State . . . .

42 U.S.C. § 10805(a)(1)(B).

> Section 10801 provides, in relevant part:

> The purposes of this chapter are . . . to assist States to establish and operate a protection and advocacy system for individuals with mental illness which will - - protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitute and Federal and State statutes . . . .

42 U.S.C. § 10801(b)(2)(A).

Defendant argues that, in passing the above-quoted laws, Congress "unequivocally

bestowed representational standing upon [Defendant] in further of its mandated duties as a P&A

[System] under the plain language of the subject statutes and regulations."  Opp'n at 23.

Defendant also cites cases where district courts have allowed P&A Systems to bring claims in a

representational capacity, pursuant to the above-quoted statutes.  See Trautz v. Weisman, 846 F.

Supp. 1160, 1162–63 (S.D.N.Y. 1994) (finding that Disability Advocates, Inc. had standing

under 42 U.S.C. § 10805(a)(1)(B) to bring a claim for injunctive relief for alleged violations of

the Rehabilitation Act, RICO, civil rights laws, and state law); Rubenstein v. Benedictine Hosp., 790 F. Supp. 396, 408–09 (N.D.N.Y. 1992) (finding that Disability Advocates, Inc. had standing under 42 U.S.C. § 10805(a) to participate as one of several plaintiffs in a civil rights suit that requested, in total, injunctive relief and damages for violations of the Constitution, civil rights laws, and state law); Goldstein v. Coughlin, 83 F.R.D. 613, 614 (W.D.N.Y. 1979) (finding that plaintiff advocacy organization had standing under 42 U.S.C. § 6012, a predecessor statute to 42 U.S.C. § 15043, to pursue discovery and injunctive relief on behalf of a developmentally disabled individual for violations of the Developmentally Disabled Assistance and Bill of Rights Act, the Rehabilitation Act, the federal and New York state constitutions, and the Mental Hygiene Law of New York State).

This same basis for standing was rejected in Disability Advocates, Inc. v. New York Coalition for Quality Assisted Living, Inc., 675 F.3d 149 (2d Cir. 2012) (not cited by the parties). There, Disability Advocates (Defendant in this case, but the plaintiff in the Second Circuit case) asserted standing to sue state agencies and officials on behalf of persons with mental illness residing in New York City for an alleged violation of the "integration mandate" of Title II of the ADA and Section 504 of the Rehabilitation Act. The suit requested injunctive and declaratory relief. Id. at 154. In the district court, Judge Garaufis found Disability Advocates had representational standing pursuant to 42 U.S.C. § 10805(a)(1)(B) on behalf of its "constituents" with mental illness who resided or might one day reside in certain "adult homes" in New York City. Id. Following a bench trial, Judge Garaufis entered judgment for Disability Advocates. Id. On appeal, the Second Circuit vacated the judgment and held that Disability Advocates did not have standing under Section 10805 because Disability Advocates was "not a P&A *system* but a *contractor* to the system." Id. at 158 (emphasis in original). The Second Circuit further held

13

that Disability Advocates had not established traditional associational standing because the persons it purported to represent did not show an "indicia of membership" in the organization. Id. at 159 (citing Hunt, 432 U.S. at 343).

It is unclear whether the Second Circuit's holding applies to this case. The statute the Second Circuit cited for the proposition that Defendant was a contractor, rather than a P&A System itself, was repealed in 2013. See N.Y. Mental Hyg. Law § 45.07(p).

To the extent Defendant is now New York's designated P&A System—and it alleges that it is—its claims for representational standing are still deficient. First, the statutes giving rise to Defendant's assertion of standing are limited to representational claims brought on behalf of disabled persons *in the state of New York*. See 42 U.S.C. § 15043(a)(2)(A)(i) (giving P&A Systems the authority to "pursue legal, administrative, and other appropriate remedies . . . to ensure . . . the rights of [individuals with developmental disabilities] *within the State*") (emphasis added); id. § 10805(a)(1)(B) (giving P&A Systems the authority to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness *who are receiving care or treatment in the State*") (emphasis added). Because Plaintiff is located in Pennsylvania, AC ¶ 15, and Defendant has not otherwise alleged the location of Plaintiff's patients it purports to sue on behalf of, Defendant has failed to sufficiently assert standing on the basis of the above-quoted statutes. Second, Defendant has not identified any legal precedent supporting its position that it may sue in a representational capacity for money damages. See Pa. Psychiatric Soc., 280 F.3d at 284. Finally, Defendant has not identified any legal precedent extending the authority of 42 U.S.C. §§ 15043 and 10805 to retaliation claims under the ADA or Section 504 of the Rehabilitation Act.

For these reasons, Counts II and III of Defendant's Amended Counterclaims are dismissed in their entirety. The portions of Counts II and III that are premised on Defendant's purported injury and on Defendant's employees' purported injuries are dismissed with prejudice. The portions of Counts II and III that are premised on injuries to Plaintiff's residents and patients are dismissed without prejudice.[5]

### C. Count IV: Common Law Abuse of Legal Process

#### 1. Parties' Contentions

In its motion to dismiss, Plaintiff contends that Defendant's claim for common law abuse of legal process should be dismissed because:

(1) Defendant has not plausibly alleged that Plaintiff used legal process primarily for an improper purpose; and

(2) Defendant has not alleged that it suffered cognizable harm as a result of the alleged abuse of process;

In response, Defendant asserts that:

(1) Plaintiff's settlement demand letter, which forms the basis of the claim, can be used to show that Defendant's purpose was primarily improper;

(2) Plaintiff's settlement letter demonstrates that Plaintiff sought to extract unlawful concessions through its lawsuit; and

(3) Defendant has sufficiently alleged harm at the pleading stage.

In its reply, Plaintiff contends that:

(1) A settlement proposal cannot cause harm by itself; and

(2) To the extent that any settlement condition was inconsistent with Defendant's investigative mandate, it was free to reject the proposal.

---

[5] The Court does not make any ruling on the ability of Defendant to represent Plaintiff's patients/residents on the claims stated in Counts II and III. If Defendant attempts to replead on these grounds, it must provide specific facts that warrant this Court concluding such claims are plausible under existing law.

### 2.    Analysis

In order to state a claim for abuse of process, Defendant must allege that Plaintiff: (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designated, and (3) harm has been caused to the plaintiff.  Langman v. Keystone Nazareth Bank & Trust Co., 502 F. App'x 220, 224 (3d Cir. 2012) (citing Lerner v. Lerner, 954 A.2d 1229, 1238 (Pa. Super. 2008)).  "The essence of an abuse of process claim is that proceedings are used for a purpose not intended by the law."  Cameron v. Graphic Mgmt. Assocs., Inc., 817 F. Supp. 19, 21 (E.D. Pa. 1992) (Cahn, J.).  As such, "there is no cause of action for abuse of process if the claimant, even with bad intentions, merely carries out the process to its authorized conclusion."  Id.  A plausible cause of action for abuse of process "usually pertains to situations involving 'extortion by means of attachment, execution or garnishment, and blackmail by means of arrest or criminal prosecution.'"  Id. (quoting Zappala v. Hub Foods, Inc., 683 F. Supp. 127, 129 (W.D. Pa. 1988)).

Defendant's abuse of process claim is premised on certain demands allegedly contained in a settlement letter sent by Plaintiff after commencing litigation.[6]  Defendant takes issue with Plaintiff's demands that:

(1)    Defendant cease actively soliciting Plaintiff's clients to be represented by Defendant's attorneys;

(2)    Defendant's employee Michael Fiske be excluded from any future monitoring of Plaintiff's facilities; and

---

[6]    In assessing whether Defendant has stated a cause of action for abuse of legal process, this Court makes no determination as to the settlement letter's eventual admissibility or inadmissibility under Federal Rule of Evidence 408.

(3)   Defendant agree to a consent order appointing a monitor to observe Defendant's investigation of Plaintiff's facilities.

<u>See</u> AC ¶ 123(a)–(b); Opp'n at 27.

Defendant claims that these demands are evidence of Plaintiff's improper agenda in pursuing this litigation; and Defendant also claims that if it had accepted the conditions of Plaintiff's settlement letter, it would have violated federal law and interfered with attorney-client relationships.  Opp'n at 26.

The allegations described above are insufficient to support an abuse of process claim. Defendant alleges that the settlement demands were not "legitimate object[s] of the legal process."  AC ¶ 122.   But the fact that Plaintiff made demands that Defendant deemed objectionable and contrary to its federal mandate does not rise to the level of an abuse of process. Rather, the allegations suggest that Plaintiff's primary purpose in making those demands was to present an opening offer to settle this case—the very purpose for which the settlement process was designed.[7]  Even if Plaintiff engaged in the process with "bad intentions," the settlement negotiation was carried out to its authorized conclusion.  That is, Defendant rejected Plaintiff's settlement letter and the contested demands are no longer at issue.  Nothing about these

_____

[7]      Defendant relies on <u>BTG Int'l Inc. v. Bioactive Labs.</u>, Civ. A. No. 15-04885, 2016 WL 3519712 (E.D. Pa. 2016) (Pappert, J.) to argue that "[s]ettlement demands with terms that are illegal, improper or violate the law can be used as the basis for an abuse of process cause of action."  Opp. at 33.  However, in <u>BTG Int'l</u>, the Court declined to dismiss the plaintiff's abuse of process claim premised on the defendant's filing of a separate administrative action.  To support that claim, the plaintiff pointed to the demands contained in the defendant's settlement offer, which were unrelated to the subject matter at issue in the action, and thus supported the claim that the action was filed for an extortionate purpose.  2016 WL 3519712 at *3.  Here, by contrast, Defendant argues that the settlement letter itself was the abuse of process.  <u>See</u> Opp'n at 34.

allegations suggests that Plaintiff used the settlement process for any purpose other than that intended by law.

Allowing Defendant to proceed on its counterclaim for abuse of process would be very confusing to the jury that would also be tasked with hearing Defendant's properly pled counterclaims. For all of these reasons, Count IV must be dismissed.[8]

### D. Count V: Violation of New York Anti-SLAPP Law

#### 1. Parties' Contentions

With respect to Count V, Plaintiff's motion to dismiss contends that:

    (1) New York's Anti-SLAPP statute should not apply because Pennsylvania law applies; and

    (2) Even applying the Anti-SLAPP statute, Defendant has failed to plead facts supporting its claim.

In its response, Defendant asserts that:

    (1) New York law applies to the Anti-SLAPP counterclaim; and
    (2) Defendant's counterclaim properly alleges a cause of action under New York law.

#### 2. Conflict of Law Analysis

Although this Court has already determined that Pennsylvania law governs Plaintiff's claim for defamation, a separate conflict of law analysis is required to determine the law that should govern Defendant's Anti-SLAPP counterclaim. See <u>Berg Chilling Sys., Inc. v. Hull Corp.</u>, 435 F.3d 455 (3d Cir. 2006) (explaining that Pennsylvania rules require a choice of law

---

[8]     Despite averring that "[t]he 'legal process' at issue in the present matter is [Plaintiff's] settlement demand," Opp. at 34, Defendant's abuse of process claim also alleges that Plaintiff served improper discovery requests and demanded improper injunctive relief. <u>See</u> AC ¶ 123(c)–(f); Opp. at 37, 40. To the extent these legal processes form the basis for Defendant's abuse of process claim, they must also be dismissed. The parties submitted a Stipulation and Order governing the disclosure of confidential information, which the Court signed on September 28, 2018. (ECF 65). Defendant's reluctance to produce certain information in discovery has thus been resolved. Furthermore, if Plaintiff's requested injunction would violate federal law, this Court would simply not grant the relief. The request itself is certainly not abusive.

analysis for each substantive issue in an action).  A federal court exercising diversity jurisdiction applies the conflict of law rules of the forum state.  Pennsylvania's two step framework for an issue of choice of law requires a determination of two questions.  First, the Court determines whether a real conflict exists between the respective laws.  Hammersmith v. TIG Ins. Co., 480 F.3d 220, 230 (3d Cir. 2007).  Where one state has a law affecting the outcome of the claim and the other state has no comparable law, a true conflict exists.  Gallagher v. Med. Research Consultants, LLP, No. 04-236, 2004 WL 2223312, at *4–5 (E.D. Pa. Oct. 1, 2004) (Dalzell, J.) (finding, on cross motions for summary judgment, a "true conflict" where Texas's Statute of Frauds required contracts of more than one year to be in writing and Pennsylvania's Statute of Frauds contained no such limitation); see also Ranbaxy Laboratories, Inc. v. First Databank, Inc., No. 13-859, 2014 WL 982742, at *5 (M.D. Fla. Mar. 12, 2014) (noting, on a motion to strike, a "genuine conflict" existed between California, New Jersey, and Florida law because California had an anti-SLAPP statute and the latter two states did not).[9]  Because New York has an applicable Anti-SLAPP statute and Pennsylvania does not, there is a true conflict in this case that merits further analysis.

The second step is to determine which state "has the greater interest in the application of its law."  Hammersmith, 480 F.3d at 231.  Such analysis utilizes two factors:  (1) an examination of the contacts to determine the most significant relationship, and (2) an interest-based analysis

_____

[9]     Defendant contends that the lack of an applicable anti-SLAPP statute in Pennsylvania creates a "false conflict" with New York law.  A "false conflict" exists when only one state's interests would be impaired by the application of the other state's law.  See LeJeune v. Bliss-Salem, Inc., 85 F.3d 1069, 1071–72 (3d Cir. 1996).  However, the fact that the Pennsylvania General Assembly has not passed an Anti-SLAPP law equivalent to the New York statute does not, on its own, suggest that Pennsylvania has no interest in applying its law to this case.  See Gallagher, 2004 WL 2223312, at *5 ("Because the Pennsylvania General Assembly never enacted a provision like [the other state at issue], we are wary of divining legislative intent from legislative silence.").

of state policies with respect to the controversy.  <u>Melville v. Amer. Home Assurance Co.</u>, 584 F.2d 1306, 1311 (3d Cir. 1978).  The contacts to be taken into account include:  (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered.  <u>See</u> <u>Landenheim v. Starr Transit Co., Inc.</u>, 242 F. Supp. 3d 395, 403 (E.D. Pa. 2017) (Padova, J.) (citing Restatement (Second) of Conflict of Laws § 145(2)).  Here, although Defendant is domiciled in New York, its injury—the filing of the defamation claim—occurred in Pennsylvania, the conduct causing the injury took place in Pennsylvania, and Plaintiff is domiciled in Pennsylvania.  The relationship between the parties revolves around Pennsylvania, given that Defendant initiated the interactions between the parties through its travels to Plaintiff's location to conduct its investigations.

As for the second factor in the choice of law analysis, it weighs in favor of applying the New York Anti-SLAPP law.  In enacting its Anti-SLAPP statute, New York declared its policy "that the rights of citizens to participate freely in the public process must be safeguarded with great diligence."  <u>Allan & Allan Arts Ltd. V. Rosenblum</u>, 201 A.D.2d 136, 143–44 (N.Y. App. Div. 1994).  The state was concerned that "the threat of personal damages and litigation costs can be and has been used as a means of harassing, intimidating or punishing individuals, unincorporated associations, not-for-profit corporations and others who have involved themselves in public affairs."  <u>Id.</u>  Although Pennsylvania's legislative silence on this issue should not be read as disinterest, the parties have not identified any reasons for the General Assembly's decision not to afford similar protections to its citizens.  Defendant is a New York citizen and the speech at issue here could be considered to involve public affairs, particularly as

it relates to New York residents under Plaintiff's care. Therefore, New York has the stronger interest in applying its Anti-SLAPP law to this case.

### 3. Analysis of Anti-SLAPP Claim

To bring a cause of action under New York's Anti-SLAPP statute: "1) there must be a public application or petition, 2) the public applicant or permittee of that application must file a lawsuit against a person [that] is materially related to any efforts of the defendant to report on, comment on, rule on, challenge or oppose such application or permission, and 3) the lawsuit must be, at a minimum, substantially without merit." Gilman v. Spitzer, 902 F. Supp. 2d 389, 398 (S.D.N.Y. 2012), aff'd, 538 F. App'x 45 (2d Cir. 2013) (internal quotations omitted). "Uniformly, the New York courts have found that the persons properly alleged to be public applicants within the meaning of the anti-SLAPP statute were persons whose proposed actions required government permission." Chandok v. Klessig, 632 F.3d 803, 819 (2d Cir. 2011); see also Civil Rights Law § 76–a[1][b] (defining a public applicant or permittee as "any person who has applied for or obtained a permit, zoning change, lease, license, certificate or other entitlement for use or permission to act from any government body"). Defendant alleges, and Plaintiff does not dispute, that Plaintiff "possesses numerous licenses, permits, approvals, clearances, compliances, certificates, and registrations issued by multiple government entities." AC ¶ 156; see also Compl. ¶¶ 24–26 (averring that Plaintiff is licensed to operate by the Pennsylvania Department of Human Services and subject to inspection by the New York State Education Department and the New York Justice Center for the Protection of People with Special Needs). Defendant has thus alleged sufficient facts to claim Plaintiff is a public applicant under the anti-SLAPP statute.

The parties cite contrary decisions from the New York Supreme Court, Appellate Division, to explain the second prong of an Anti-SLAPP claim.  Plaintiff cites <u>Guerrero v. Carva</u>, 10 A.D.3d 105 (N.Y. App. Div. 2004) (1st Dep't), where the plaintiffs—managers of publicly subsidized housing properties—filed a defamation claim against two tenants after the tenants distributed flyers in their community asserting that the plaintiffs were unfit to manage buildings, had forced illegal evictions, and had engaged in racial discrimination.  The tenants moved to dismiss the complaint on the ground that it constituted a baseless SLAPP suit, and requested damages and attorneys' fees under the Anti-SLAPP law.  <u>Id.</u> at 110.  Because the plaintiffs did not challenge their status as a "public applicant or permittee," the <u>Guerrero</u> court was tasked only with determining whether the suit was "materially related" to the defendants' efforts to comment on or oppose the plaintiffs' applications.  <u>Id.</u> at 117.  Noting that the Anti-SLAPP statute must be construed narrowly because it derogates common law, the court held that "[a]t a minimum, the anti-SLAPP statute should be read to require that a defendant identify, at least in general terms, the application or permit being challenged or commented on, and that the defendant's communications be substantially related to such application or permit."  <u>Id.</u>  The court went on to hold that the tenants' "brief allusion to plaintiffs' status as a manager and landlord of East Harlem properties, together with the implication that plaintiffs were "receiving" those properties pursuant to a public grant, was clearly insufficient to meet this standard."  <u>Id.</u> at 117.

By contrast, Defendant cites <u>Edwards v. Martin</u>, 158 A.D.3d 1044 (N.Y. App. Div. 2018) (3d Dep't).  In <u>Edwards</u>, the plaintiffs—owners of a yard waste composting facility—sued two of their neighbors for defamation after the neighbors made public statements complaining that the plaintiffs operated their business illegally and caused harm to their health and property.  <u>Id.</u> at 1045.  The neighbors asserted a counterclaim under the Anti-SLAPP law, and the plaintiffs

moved to dismiss that counterclaim.  Id. at 1045–46.  The court held that the plaintiffs were public permittees because operation of their business was subject to permission and oversight by New York's Department of Environmental Conservation.  Id. at 1047.  Without citing Guerrero, the Edwards court took a much broader approach in holding that the neighbors' statements were materially related to the plaintiffs' registration because they involved specific hazardous conditions that evoked particular regulations governing the operation of plaintiffs' business, even though the statements did not necessarily identify those regulations.  Id.[10]

Assuming, arguendo, that Defendant's Anti-SLAPP claim is controlled by Edwards, the DRNY Report could be considered an effort by Defendant to report on, comment on, rule on, challenge or oppose Plaintiff's licensure.

Finally, the Amended Counterclaims contain sufficient allegations that, when taken as true, make out a plausible claim that Plaintiff's lawsuit is "substantially without merit" such as to overcome Plaintiff's motion to dismiss.

Plaintiff's motion to dismiss Count V of the Amended Counterclaims is therefore denied.

## VI. Conclusion

Therefore, for all the above reasons, Plaintiff's Motion to Dismiss Defendant's Amended Counterclaims (ECF 43) is granted in part and denied in part.

An appropriate Order follows.

O:\CIVIL 18\18-296 Woods Services v Disability Advocates\18cv296 Memo re MTD Counterclaims.docx

---

[10]    The neighbors in Edwards also cross moved to dismiss the plaintiffs' complaint on the basis that it was a SLAPP action.  After determining that the neighbors successfully stated a claim under the Anti-SLAPP statute, the court went on to find dismissal on that ground appropriate.  Id. at 1047–48.